**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Robert COOK and Charles Stafford Jackson, a/k/a Cal Stewart, Defendants-Appellants.**

**No. 76–3075.**

United States Court of Appeals, Fifth Circuit.

Aug. 19, 1977.

Rehearing Denied Oct. 14, 1977.

Emmett Colvin, Gary D. Jackson, Dallas, Tex., for Cook.

Ralph J. Blagg, Texarkana, Tex., for Cook on bail application only.

Allen Moore, Odessa, Tex., (Court-appointed), for Jackson.

John E. Clark, U. S. Atty., LeRoy Morgan Jahn, Wayne F. Speck, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before CLARK and GEE, Circuit Judges, and MARKEY,* Chief Judge.

MARKEY, Chief Judge:

Defendants (Cook and Jackson) were indicted on September 23, 1975, by a federal

---

\* Of the U. S. Court of Customs and Patent Appeals, sitting by designation.

grand jury of the Western District of Texas on seventeen counts of violating the federal mail fraud statute. 18 U.S.C. § 1341.[1] At the trial, which took place from May 4 to May 12, 1976, the district court granted defendants' motions for judgment of acquittal as to counts 10 and 11 of the indictment, and the jury found Cook and Jackson guilty on the remaining fifteen counts. On July 16, 1976, the district court denied motions for judgment notwithstanding the verdict and for new trial, and imposed sentences.[2] Notices of appeal were timely filed on July 23, 1976. His motion to join Cook's brief having been granted, Jackson did not submit a separate brief to this court.

## Issue

The dispositive issue is whether reversible error occurred in the admission of injunction documents resulting from settlement of a prior civil action.[3]

Because we hold the admission of the consent injunction documents to have been an error resulting in substantial prejudice in Cook's case, we reverse his conviction and remand for a new trial. The evidence of Jackson's guilt being so overwhelming as to render harmless the admission of the documents, we affirm his conviction.

## Facts

The fraudulent scheme alleged in the indictment involved the sale of fractional undivided interests in oil and gas drilling ventures generally referred to as "Schedule D" offerings.[4] Widely used in the industry for many years, "Schedule D" operations offer potential investors a security interest in an oil or natural gas venture, involving a well to be drilled on a specified tract, and a share in any profits if oil or natural gas is found. The Schedule D form insures disclosure of information about the proposed well, the financial makeup of the venture, the offeror, geological features and prior

1. § 1341. Frauds and swindles

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Each sentence consisted of 5 years on count 1 and 5 years on count 7 to run consecutively. In addition, each defendant received 5 years on counts 2, 4, 8, 9 and 12 to run concurrently with count 1, and 5 years on counts 3, 5, 6, 13, 14, 15, 16 and 17, to run concurrently with count 7.

3. Cook has submitted, pro se, a supplemental brief and other materials, regarding assistance of counsel and newly discovered evidence. In view of our disposition of the case, it is unnecessary to address those matters. We will not comment on Cook's challenge to the sufficiency of the evidence, in view of the possibility of a new trial. Cook's previous conviction being available for impeachment under Fed.R.Evid. 609(a)(2) without regard to prejudice, because it involved fraud, his allegation of error in denial of his in limine motion is without merit. Contrary to Cook's last contention, the jury instruction regarding his security interest in Arcola was permissible in view of testimony concerning loans by Olympic to Arcola and the admission of the notes evidencing those loans.

4. Federal and state laws require registration of the offer and sale of securities, absent an exemption. Regulation B, pursuant to section 3(b) of the Securities Act of 1933, provides an exemption for the sale of fractional undivided interests in oil and gas rights in offerings aggregating less than a $250,000 total sale price. Schedule D is a form promulgated by the Securities and Exchange Commission (S.E.C.) pursuant to Regulation B. It must be filed with the S.E.C. and delivered to potential investors in oil and gas ventures of the type involved in this case.

development of the tract, and the nature of the interests offered. The fraud here is alleged to reside in untrue statements regarding the ownership and extent of the mineral leases involved in Schedule D offerings mailed by Arcola Petroleum Corporation (Arcola).

Cook had been involved in the oil and gas business for several years prior to February, 1974, when the present scheme was allegedly originated. Prior to and during the time referred to in the present indictment, he was the sole owner of Olympic Petroleum Corporation (Olympic), of Dallas, Texas, a company engaged primarily in the sale of fractional, undivided interests in oil and gas drilling ventures. Jackson was employed by Olympic as its sales manager until February, 1974, when, through Olympic's attorney, Arcola was incorporated. A former Olympic salesman named Daniel Horrell had been asked by Jackson to serve as Arcola's president in January, 1974. Horrell invested nothing for his 10,000 shares of stock, but gave Jackson a five-year option to buy the shares for $1,000. Decisions were made by Jackson. Horrell played no real part in decision-making, considering himself a salesman and receiving only $100.00 a week salary, exclusive of sales commissions. Horrell remained president until January, 1975, when Bob Ewing, another former Olympic salesman, took over the position. In February and March, 1974, Arcola got an initial stake from Olympic in the form of several loans, established its headquarters in Scottsdale, Arizona, and opened an office in Midland, Texas. All of these activities were directed by Jackson, who used the alias "Cal Stewart." Jackson also employed "Latigo Consulting Company" in most of his financial dealings with Arcola.

In April, 1974, Arcola mailed Schedule D offerings to several hundred potential investors around the country, offering to sell fractional undivided interests in a proposed well to be drilled in Marion County, Texas. The offering had been filed with the S.E.C. and approval had been obtained before the mailing. The offering stated that the well would be drilled on a specified tract, the mineral lease on which was 100% owned by Arcola. The evidence at trial showed conclusively, however, that Arcola could not have owned 100% of the mineral lease at the time the offering was mailed. Two subsequent offerings, mailed in September, 1974, concerned proposed wells on a tract in Harding County, New Mexico. Representations respecting Arcola's ownership of the entire mineral leases on that tract were also conclusively refuted at trial. Investors purchased interests in all three wells by mail, in amounts ranging from $2000 to $2200 per share, and totaling $245,000. The Marion County well was drilled to a depth of 1050 feet by a service contractor, and later continued to 3666 feet by Omega, a Cook-owned subsidiary of Olympic. The well was plugged at that point. The New Mexico wells were never drilled.

### The Consent Injunctions

In February, 1974, Cook, Jackson, and several other Olympic employees, and Olympic consented to the entry of orders of injunction by the U. S. District Court for the Northern District of Texas, in settlement of a civil action filed by the S.E.C. The injunctions prohibited violations of the specific securities law statutes listed in the S.E.C. complaint, but went on to generally prohibit the selling of securities in a manner violative of federal law and listed a number of particular improper acts, ten of which would constitute fraud.

The injunction orders were entered pursuant to a settlement agreement, the following terms of which were incorporated in each injunction:

### STIPULATION AND CONSENT TO ORDER OF PRELIMINARY INJUNCTION

The defendant, WILLIAM R. COOK, without either admitting or denying the allegations in plaintiff's complaint, and for the purpose of this action and this action only, consents to the entry of the foregoing order preliminarily enjoining him from violations of Sections 5(a), 5(c)

and 17(a) of the Securities Act of 1933, as amended [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934, as amended [15 U.S.C. § 78j(b)] and Rule 10b–5 thereunder [17 C.F.R. 240.10b–5], as prayed for in plaintiff's Complaint.

At the trial below, the government offered the injunction documents applicable to Cook, Jackson and Olympic. Cook and Jackson objected, relying upon Rule 403,[5] Federal Rules of Evidence.[6] The court overruled the objections and admitted all three injunction documents. Limiting instructions were given the jury when the documents were admitted and again in the court's final charge.

## OPINION

### The Government's Position

The government argues that the injunctions were admissible under Rule 404(b) of the Federal Rules of Evidence,[7] and asserts that "proof of the fact that the injunctions existed was . . . necessary to show the common scheme of appellant['s] . . . to perpetrate fraud on unwitting investors" and to prove "intent and motive, the existence of a plan or scheme to defraud through the establishment of Arcola, and

. . . knowledge of official disapproval of . . . past course of conduct."

But the "acts" referred to in Rule 404(b) are not any and all acts. The rule is specifically directed to evidence of crimes, wrongs, and other acts offered to prove that a person had previously acted in a particular manner. To qualify for admission under Rule 404(b), therefore, the injunction documents here would have to evidence the commission of some crime, wrong or act at least related in nature to the present charge of mail fraud. The government's difficulty is that the present injunction documents, specifically neither admitting nor denying any act of any kind, evidence solely the fact that Cook, Jackson and Olympic consented to entry of the injunctions. The consent to entry of injunctions of the type herein does not constitute a crime, a wrong or an act within the context of Rule 404(b).

The government's reliance on *United States v. Urdiales*, 523 F.2d 1245 (5th Cir. 1975), cert. den., 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976) and *United States v. Arteaga-Limones*, 529 F.2d 1183 (5th Cir.), cert. den., 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976) is misplaced.[8] Both cases involved evidence of prior *wrongful* acts. In *Urdiales* the evidence involved a prior heroin distribution charge, dismissed

5. Rule 403.

*Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time*

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

6. Cook and Jackson also urged that the government was estopped from using the injunction documents because of the specific prohibition they contained against their use for any purpose other than "the purpose of this action." The argument is persuasive. In simple equity, the government should not be allowed to induce or obtain a defendant's consent to settlement under specific terms, and later violate those terms. However, we need not reach the contention, Rule 403 being dispositive.

7. Rule 404.

*Character Evidence Not Admissible To Prove Conduct; Exceptions; Other Crimes*

\* \* \* \* \* \*

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

8. *United States v. Middlebrooks*, 431 F.2d 299 (5th Cir. 1970), cert. den., 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971), also relied upon by the government, involved the admission of summaries of complaints made by the Chamber of Commerce about the defendant's sales scheme. The objection to that evidence was apparently based on its hearsay character, not on the Rule 403 prejudice assertion involved here.

when the defendant agreed to cooperate with the government. In *Arteaga*, the evidence involved a prior conviction for "smuggling marijuana." Here, the government has not attempted to introduce any evidence of any prior fraudulent or other improper acts by Cook or Jackson. Only the injunction documents themselves are offered, from which, if *Urdiales* and *Arteaga* were apt, the jury would have to infer that prior wrongful acts had been committed, an inference impermissible. Far from supporting even an inference of a common "scheme to defraud," intent, motive, or knowledge of disapproval of past conduct, the act of consenting to the injunctions herein was not a wrongful act and does not even infer the commission of the acts originally set forth in the S.E.C. civil complaint.

Assuming, however, that Cook's and Jackson's acts of consenting to the injunctions fall within the context of "other acts" in Rule 404(b), the admission of the injunction documents, as an exception to the exclusionary force of Rule 404, remains subject to the balancing test of Rule 403. Advisory Committee Note to Rule 404. *United States v. Catano*, 553 F.2d 497 (5th Cir. 1977). The probative value of the evidence under consideration must be determined and compared with the danger of unfair prejudice occasioned by its admission, error being found when it is clear that the latter substantially outweighs the former.[9]

### Probative Value

The government, throughout the trial, emphasized the importance of the injunctions as the catalyst for the formation of Arcola. Its explanation, when the injunction documents were offered, was that they supplied the motive for forming Arcola. Cook asserted that the injunctions merely removed Olympic's need for its large sales force, and that he had therefore simply assisted several former salesmen, including Dan Horrell, to start their own businesses. There is no dispute, therefore, that the in-

junctions provided at least a part of the environment surrounding the formation of Arcola. If the fact that Cook, Jackson, and Olympic had been enjoined from selling securities in any manner contrary to law were even peripherally relevant to the prosecution of Cook and Jackson for mail fraud, that minimal probative value was exhausted in the prior testimony of government witnesses about the injunctions. The injunction documents themselves thus had little or no independent probative value in relation to any disputed question in the case.

### Prejudicial Effect

Rule 403 permits exclusion of relevant evidence only when the prejudice derived therefrom is "unfair." The Advisory Committee's note to Fed.R.Evid. 403 states, in part:

"Unfair prejudice" within this context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

The improper suggestion which the injunction documents here were fully capable of producing, was that the fraudulent acts listed in those documents had been committed by Cook and Jackson who consented to the orders. In essence, the unfairness of admitting the injunction documents lies in the danger of jurors being unable to consider them only for the specific purpose for which they were created. The injunction documents became evidence, in effect, of the defendants' bad character, when that character had not been placed in issue. Convictions based on such evidence have consistently been reversed by the courts, and F.R. Evid. 404, *supra* note 7, was specifically drafted to avoid such improper results.

Dean Wigmore stated the rationale:

The deep tendency of human nature to punish, not because our victim is guilty this time, but because he is a bad man

---

9. This court has, of course, recognized that the balancing test under Rule 403 is a matter within the sound discretion of the trial court. *United States v. Brown*, 547 F.2d 1264 (5th Cir.

1977). We must, however, exercise our proper role when, as here, an abuse of that discretion is shown.

and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury, in or out of Court.

1 Wigmore, *Evidence*, § 57, at 456 (3d Ed. 1940).

The concern for unfair and undue prejudice accounts for the limitation in Rule 404(b) whereby evidence of other crimes, wrongs, or acts *may* be admissible for other purposes, and for the necessity of the balancing test of Rule 403. The Advisory Committee note to Rule 404 states:

> No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence, in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403(a).

The danger of unfair prejudice is even more pronounced here, where the evidence is so strongly suggestive of other wrongs, and yet the injunctions were obtained by compromise, with the defendants neither admitting nor denying any wrongdoing.

The trial court's cautionary instructions could not dispel the possibility of unfair prejudice in this case. Even the best instruction may be insufficient:

> The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction.
>
> *Bruton v. United States*, 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968) quoting *Krulewitch v. United States, supra*, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (Jackson, J., concurring).

But a limiting instruction is particularly likely to be ineffective against prejudicial evidence of the type herein. See Dolan,

*Rule 403: The Prejudice Rule in Evidence*, 49 So.Cal.L.Rev. 220 (1976). In this long and complicated conspiracy type case involving securities law and detailed aspects of real property and minerals law, the jury was faced with a difficult task at best. They were required to sort out all the evidence and to use it only for specifically designated purposes against one defendant or the other, or both. Over fifty documentary exhibits were admitted. Under the circumstances of this case, we cannot say that the limiting instruction on use of the injunction documents cured the error.[10]

An intangible factor inherent in the admission of disputed evidence is the danger that it may weigh more heavily on the jurors because of the emphasis placed upon it by limiting instructions and argument of counsel. This possibility is heightened with documentary evidence, about which the jury may have a tendency to assume or infer too much just because it can be seen and read. 7 Wigmore, *Evidence*, § 2129 (3d Ed. 1940).

> [T]he competence of evidence in the end depends upon whether it is likely, all things considered, to advance the search for the truth; and that does not inevitably follow from the fact that it is rationally relevant. . . . [T]he question is always whether what it will contribute rationally to a solution is more than matched by its possibilities of confusion and surprise, by the length of time and expense it will involve, and by the chance that it will divert the jury from the facts which should control their verdict.
>
> *United States v. Krulewitch*, 145 F.2d 76, 80 (2d Cir. 1944), *rev'd* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

In view of the minimal probative value of the injunction documents and the substan-

---

10. Aware that a Federal Trade Commission consent injunction was held properly admissible in *New England Enterprises, Inc. v. United States*, 400 F.2d 58 (1st Cir. 1968), we reiterate that Rule 403 requires that each case be decided on its own facts. Situations involving a danger of prejudice are not susceptible to general rules, every defendant being entitled to an independent balancing test on the peculiar facts and circumstances of his or her case. Under differing circumstances, a consent injunction may prove highly probative of some disputed or necessary fact, and, after proper application of Rule 403, may be entirely permissible as evidence.

tial danger that they may have unfairly prejudiced the jury, we conclude that their admission was error.

### Reversible Error

Not every error mandates reversal. If taking the record as a whole, the error is "harmless beyond a reasonable doubt," the conviction must be affirmed. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Though it was error to admit the injunction documents, the error was clearly harmless, within the *Chapman* standard in Jackson's case. A complete examination of the entire record overwhelmingly establishes that Jackson was the motivating force behind virtually every action of Arcola, that he personally received and benefited from a substantial portion of the invested funds, and that he was or should have been aware of the status of title to the leaseholds in which interests were offered for sale.

In Cook's case, however, we are left in grave doubt as to whether the error may not have had substantial influence in bringing about the verdict. The tenuous inference that the injunctions constituted a "motive" tying Cook to Jackson's formation of Arcola would require the further inference that Cook had committed the fraudulent acts listed in the injunction documents and desired to continue to do so through the vehicle of Arcola. The two-page list attached to the injunction documents and describing numerous fraudulent acts was thus likely to have had a significant prejudicial impact on the minds of the jurors. The evidence connecting Cook to the alleged scheme was entirely circumstantial and largely uncorroborated. In view of the possibility of a new trial, see note 3 *supra*, we do no more than note the exceedingly close case against Cook and our inability to say that the erroneous admission of the injunction documents may not have tipped the scales against him.

The conviction of Jackson is affirmed. The conviction of Cook is reversed and the case is remanded for a new trial.

Affirmed as to appellant Jackson.

Reversed and Remanded as to appellant Cook.